CHARLES CUNNINGHAM AND ROSE M. CURLESS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Cunningham v. Commissioner
Docket Nos. 18093-83; 18672-83; 24602-83.
United States Tax Court
T.C. Memo 1989-260; 1989 Tax Ct. Memo LEXIS 260; 57 T.C.M. (CCH) 547; T.C.M. (RIA) 89260; May 30, 1989. *260 Random provided computerized single-entry bookkeeping services to the public. In late 1979, P and Random executed a License Service Agreement under which P was to pay $ 24,000 to Random and Random was to pay to P certain amounts over time, depending on the volume of Random's business in Cincinnati, Ohio. P paid part of the $ 24,000 to Random in early 1980. Neither P nor Random paid anything else to the other pursuant to this agreement. P deducted the entire $ 24,000 for 1979. This agreement provides that if the agreement were not renewed, then Random would buy back P's rights under this agreement for not less than $ 24,000. Held: (1) P is not entitled to deduct any part of the $ 24,000 for 1979. (2) The resulting deficiencies are underpayments attributable to tax motivated transactions. Sec. 6621(c), I.R.C. 1954 and 1986. John N. Moore, for the petitioners. [2] *261 Robert J. Kastl, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and an addition to tax under section 6651(a)(1)[3] *262 against petitioners for 1979 as follows: Addition to Tax
Docket No.
Petitioners
Deficiency
Sec. 6651(a)(1)
18093-83
Charles Cunningham
$  6,830
--
and Rose M. Curless
19672-83
Lindley A. and
10,478
--
Sharon K. Ropp
24602-83
Estate of Gerald A.
7,712
$ 21
Brewer, Janet D.
Brewer, Executrix
and Janet D. Brewer
By amended answer respondent asserts that petitioners in all three dockets are liable for increased interest under section 6621(c) (formerly sec. 6621(d)), [4] *263 on account of substantial underpayments attributable to tax motivated transactions. These three cases are consolidated for trial, briefs, and opinion. The issues for decision [5] are as follows: (1) Whether deductions claimed for a computer processing service were for expenses paid or incurred in 1979; (2) Whether that service was an activity engaged in by petitioners for profit in 1979; (3) Whether petitioners' claimed deductions are not allowable under section 465 because petitioners were not at risk; and (4) If any of petitioners' claimed deductions are disallowed, then whether that results in a substantial underpayment attributable to a tax motivated transaction, within the meaning of section 6621(c). FINDINGS OF FACT [6] *264 Some of the facts have been stipulated; *265 the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases: petitioners Charles Cunningham and Rose M. Curless (hereinafter sometimes collectively referred to as "Cunningham/Curless"), husband and wife, resided in Milford, Ohio; petitioners Lindley A. Ropp and Sharon K. Ropp (hereinafter sometimes collectively referred to as "the Ropps"), husband and wife, resided in Defiance, Missouri; and petitioners Gerald A. Brewer and Janet D. Brewer (hereinafter sometimes collectively referred to as "the Brewers"), husband and wife, resided in Springdale, Ohio. [7]
Each petitioner-couple in these consolidated cases claimed $ 24,000 of trade or business deductions on the Schedule C on that couple's 1979 Federal income tax return. The business name shown on the Schedule C in each case is "Random Processing" or "Random Processing Services" and the main business activity is described as "Computer", "Computer systems Systems", or "Computer, Report Sales". None of the petitioners *266 reported any gross receipts or other income for 1979 on the Schedule C, but they reported expenses as shown on table 1. Expense
Amount Reported
Cunningham/
Curless
Ropp
Brewer
Advertising
$ 12,000
$ 23,000
$ 17,000
Legal and
--
1,000
-- Professional
Services
Licenses/
1,000
-- 1,000
License Fee
Management Fee/
Managers Fee
11,000
-- 6,000
Totals
$ 24,000
$ 24,000
$ 24,000
Each Schedule C shows "accrual" as the method of accounting. Random Processing Services (hereinafter sometimes referred to as "Random") is a corporation formed in 1979 by Monica Iles (hereinafter sometimes referred to as "Monica"). The business performed by Random had been performed by Monica, as a sole proprietor, for about 1-1/2 years before Random was incorporated. Monica was Random's president in 1979. Robert E. Iles (hereinafter sometimes referred to as "Robert") was Random's general manager in 1979 and was authorized to act on its behalf. Robert owned R. Iles Marketing, Inc. (hereinafter sometimes referred to as "Marketing"). Robert, either personally or through Marketing, was Random's exclusive marketing agent and was paid to perform marketing and advertising services for Random. Random is a service bureau for data processing, with *267 its only product being a report known as a Random Report. The computer software that produces the Random Report is Random's only substantial asset. Clients provide information to Random; based solely on this information, Random prepares for the client a Random Report, which is an unaudited income and expense report. In December 1979, the Ropps and Cunningham/Curless each entered into a "License Service Agreement" with Random. The license service agreements are identical fill-in-the-blanks forms. Robert signed each of the license service agreements on Random's behalf. The Brewers also entered into a similar license service agreement with Random in 1979. Some of the relevant provisions of the license service agreement are as follows: 1. Random wants to "promote the use of [its] computor [sic] system known as, a Do-It-Yourself, single-entry, computerized bookkeeping system, which is presently operable and in service." 2. Random will furnish the marketing materials and personnel at no cost to petitioners. 3. Random will train the system's customers at no cost to petitioners. 4. Petitioners are permitted to solicit business, but only under Random's standards and at petitioners' *268 cost. [8]
5. Random will pay to the petitioner-couple $ 1.00 for each report processed. [9] *269 6. Random "gives exclusive right to [petitioners] for his/her defined area". [10]
7. Petitioners may hire agents to promote Random' business but Random *270 "reserves the right to qualify those individuals and require proper training." Random charges $ 300 a day for 22 days (for a total of $ 6,600) for training. 8. Neither Random nor petitioners have any right to bind each other. Yet, each petitioner who deals with others regarding Random is required to state that he or she is a "Licensed Agent" of Random. [11] *271 9. Each petitioner-couple agrees to pay $ 24,000 to Random. [12]
10. The term of the agreement is 6 years, with petitioners having "the total and full option to renew the license status every six (6) years thereafter at no additional cost." If a petitioner-couple's agreement is not renewed, *272 then Random must pay to that petitioner-couple not less than the $ 24,000 "original purchase price". [13]
Cunningham/Curless "paid" the $ 24,000 due under the license service agreement by (1) signing a promissory note for $ 18,000 in 1979 and (2) paying *273 $ 6,000 in cash in 1980. Cunningham/Curless understood that the $ 18,000 note was to be paid solely out of the income generated under the license service agreement. Cunningham/Curless had not received any payment under the license service agreement as of March 1985. The Ropps "paid" the $ 24,000 due under the license service agreement by executing three promissory notes on December 17, 1979. The first note was for $ 6,000 and was due on February 15, 1980; this note was paid in full on or about February 13, 1980; the second note, also for $ 6,000, was due March 15, 1980; this note was also paid in full in 1980. The third note, for $ 12,000, states that it is "payable from the proceeds of the business at 50%, which may be deducted by Random Processing Services." The note further provides that it is "due until paid by the proceeds of the business @ 50%". Each of the three notes specifically states that it does not provide for interest. The $ 12,000 note provides as follows: $ 12,000.00 Cincinnati,Ohio, December 17, 1979
Lindley and Sharon Ropp after date, for value received, the undersigned jointly and severally promise to pay to the order of Random Processing Services at Cincinnati, *274 Ohio, the sum of Twelve Thousand Dollars and no/100 Dollars with interest[*] from the date hereof at the rate of n/a% per annum, payable from the proceeds of the business at 50%, which may be deducted by Random Processing Services
In the event of non-payment of any principal or interest hereunder, when due, the entire balance of principal then remaining unpaid, with accrued interest thereon, shall at once become due and payable at the option of the holder hereof, without notice or demand. The maker(s) and indorser(s) hereof hereby waive presentment, demand, notice of dishonor, protest and notice of non-payment and protest. Lindley Ropp Sharon K. Ropp Due until paid by the proceeds of the business @ 50%
No. Petitioner Lindley A. Ropp never acquired any clients for Random in connection with the license service agreement. Petitioner Charles Cunningham acquired at least 18 clients for Random in connection with the license service agreement. Neither Cunningham/Curless nor the Ropps received any payments from Random relative to the *275 licensing activity. The Brewers executed a promissory note in the amount of $ 18,000 as part payment of the $ 24,000 due under the license service agreement. The remaining $ 6,000 was paid in cash. The Brewers' $ 18,000 note was the same type as Cunningham/Curless' $ 18,000 note and the Ropps' $ 12,000 note. On the same days that Cunningham/Curless and the Ropps each entered into a license service agreement, they also entered into a management agreement with Marketing. The management agreements are identical fill-in-the-blanks forms. These management agreements provide that Marketing is employed to act as petitioners' "representative in the operation and maintenance of the State License" that Random granted "pursuant to a License Service Agreement". Some of the relevant provisions of the management agreements are as follows: 1. Marketing is to provide to petitioners each month "reports which show number of accounts in his/her territory and number of accounts processed and fees payable to [petitioners] in that specific monthly period." 2. Marketing could "earn commissions" in Cincinnati, but Cunningham/Curless and the Ropps are not liable to pay these commissions. [14] *276 3. The written management agreement constitutes the entire agreement between Marketing and the petitioner-couple; any modification must be in writing and signed by the parties to the management agreement. For 1980 and 1981, Cunningham/Curless reported on Schedule C of their tax returns the income and deductions shown in table 2, from their business named Structured Shelters -- Random. Table 2 1980
1981
Income
$  4,573 -0- Amortization
$  4,049
--  Depreciation
16,637
--  Interest
9,350
--  Research and de-
velopment cost
18,690
$ 3,738
Managers commission
439
549
Computer set up fee
60
--  Mgr comm random
280
--  Lease payment
-- 542
Total deductions
49,505 $ 4,829 Net profit or (loss)
($ 44,932)
($ 4,829)
*277 For 1980 and 1981, the Ropps reported on Schedule C of their tax returns the income and deductions shown in table 3, from their business named Structured Shelters (for 1980) and Ropp Investment Co. (for 1981). Table 3 1980
1981
Income
$  4,013 --  Deductions
Amortization
$  4,049
--  Depreciation
16,637
--  Interest
9,070
--  Manager's commission
813
$ 455
Computer set up fee
55
--  Research and de-
velopment cost
35,541
--  Random reports
--
80
Lease payment
--
542
Total deductions
66,165 $ 1,077 Net profit or (loss)
($ 62,152)
($ 1,077)
For 1980 and 1981, the Brewers reported on Schedule C of their tax returns the income and deductions shown in table 4, from their business named Structured Shelters. Table 4 1980
1981
Income
$  4,012 -0-
Deductions
Amortization
$  4,049
--  Depreciation
16,637
--  Interest
9,071
--  Managers fee
531
606
Lease payment
-- 704
Total deductions
30,288 $ 1,310 Net profit or (loss)
($ 26,276)
($ 1,310) Structured Shelters is related to, but separate from, petitioners' Random agencies. Each of the 1979, 1980, and 1981 tax returns of each petitioner-couple includes only one Schedule C, as described in table 1, 2, 3, and 4, supra.
R. Iles Tax Consultants, Inc., prepared the tax returns for all three petitioner-couples *278 for 1979, 1980, and 1981. Robert's signature appears on the 1979 tax returns as tax return preparer for all three petitioner-couples. Tables 5, 6, and 7 show Random's summaries of the status of petitioners' operations as Random agencies for 1979 through 1984, as best Monica could reconstruct them. (These summaries are hereinafter sometimes referred to as "Monica's summaries".) Table 5 Cunningham/Curless
1979
1980
1981
REVENUE:
Income at $ 1.00
$    832.00 $   836.00 $ 2,393.00 per account
processed
EXPENSES:
Random License
$ 1,000.00 $ 1,000.00 $ 1,000.00 Fee
Mgr. Fee at 50%
416.00 418.00 1,196.50 Mgr for salesmen
11,000.00 -0-  -0-  promo.
Bookkeeping Fee
35.00 35.00 35.00 Advertising or
12,000.00 -0-  -0-  Promotion
Interest
-0-  1,620.00 1,620.00 TOTAL EXPENSES
$ 24,451.00 $ 3,073.00 $ 3,851.50 NET PROFIT/LOSS
($ 23,619.00
($ 2,237.00)
($ 1,458.50)
Cunningham/Curless
1982
1983
1984
REVENUE:
Income at $ 1.00
$ 5,898.00 $ 3,284.00 $ 5,144.00 per account
processed
EXPENSES:
Random License
$ 1,000.00 $ 1,000.00 $ 1,000.00 Fee
Mgr. Fee at 50%
2,949.00 1,642.00 2,572.00 Mgr for salesmen
-0-  -0-  -0-  promo.
Bookkeeping Fee
35.00 35.00 35.00 Advertising or
-0-  -0-  -0-  Promotion
Interest
1,620.00 1,620.00 1,620.00 TOTAL EXPENSES
$ 5,604.00 $ 4,297.00 $ 5,227.00 NET PROFIT/LOSS
$   294.00 ($ 1,013.00)
($  83.00)
Table *279 6 Ropps
1979
1980
1981
REVENUE:
Income at $ 1.00
$    832.00 $   836.00 $ 2,393.00 per account
processed
EXPENSES:
Random License Fee
$ 1,000.00 $ 1,000.00 $ 1,000.00 Mgr. Fee at 50%
416.00 418.00 1,196.50 Bookkeeping Fee
35.00 35.00 35.00 Advertising or
23,000.000 -0-  -0-  promotion
Interest
-0-  1,147.50 1,080.00 TOTAL EXPENSES
$ 24,451.00 $ 2,600.50 $ 3,311.50 NET PROFIT/LOSS
($ 23,619.00)
($ 1,764.50)
($ 918.50)
Ropps
1982
1983
1984
REVENUE:
Income at $ 1.00
$ 5,898.00
$ 3,284.00 $ 5,144.00
per account
processed
EXPENSES:
Random License Fee
$ 1,000.00
$ 1,000.00 $ 1,000.00
Mgr. Fee at 50%
2,949.00
1,642.00 2,572.00
Bookkeeping Fee
35.00
35.00 35.00
Advertising or
-0- -0-  -0- promotion
Interest
1,080.00
1,080.00 1,080.00
TOTAL EXPENSES
$ 5,064.00
$ 3,757.00 $ 4,687.00
NET PROFIT/LOSS
$ 834.00
($ 473.00)
$ 457.00
Table 7 Brewers
1979
1980
1981
REVENUE:
Set up Fee
($ 35/acct. new)
$  210.00 $   875.00 $ 7,105.00 Processing Fees
150.00 425.00 1,235.00 at 25%
TOTAL INCOME
$    360.00 $ 1,300.00 $ 8,340.00 EXPENSES:
Random License Fee
$ 1,000.00 $ 1,000.00 $ 1,000.00 Mgr. Fee (50% of
6,000.00 212.50 617.50 processing fees
for 1980 and 1981)
Bookkeeping Fee
--  35.00 35.00 Computer set up
275.00 530.00 7,125.00 expense paid as
commission to
salesmen or installer
of the new account
Advertising
17,000.00 -0-  -0-  Interest
-0-  1,620.00 1,620.00 TOTAL EXPENSES
$ 24,275.00 $ 3,397.50 $ 10,397.50 NET PROFIT/LOSS
($ 23,915.00)
($ 2,097.50)
($ 2,057.50)
*280 Brewers
1982
1983
1984
REVENUE:
Set up Fee
($ 35/acct. new)
$ 10,335.00 $  9,425.00 $ 12,525.00 Processing Fees
3,200.00 3,172.50 3,338.63 at 25%
TOTAL INCOME
$ 13,535.00 $ 12,597.50 $ 15,863.63 EXPENSES:
Random License Fee
$  1,000.00 $  1,000.00 $  1,000.00 Mgr. Fee (50% of
1,600.00 $ 1,586.25 $ 1,669.32 processing fees
for 1980 and 1981)
Bookkeeping Fee
35.00 35.00 35.00 Computer set up
10,335.00 9,425.00 12,525.00 expense paid as
commission to
salesmen or installer
of the new account
Advertising
-0-  -0-  -0- Interest
1,620.00 1,350.00 1,080.00 TOTAL EXPENSES
$ 14,590.00 $ 13,396.25 $ 16,309.32 NET PROFIT/LOSS
($ 1,055.00)
($ 798.75)
($ 445.69)
OPINION As preliminary matter, we note that respondent's determinations as to matters of fact in the notice of deficiency are presumed to be correct, and petitioners have the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). However, respondent has the burden of proof with respect to the increased interest rate under section 6621(c), which was asserted by amendment to his answer. Zirker v. Commissioner,87 T.C. 970, 981 (1986); Reiff v. Commissioner,77 T.C. 1169, 1173 (1981); Rule 142(a). Respondent contends that petitioners have *281 failed to establish that any of the deductions claimed for 1979 relative to the license service agreements were for expenses paid or incurred in 1979. Respondent also contends that the license activity was not an activity engaged in for profit in 1979, and, furthermore, that petitioners were not at risk to any extent with respect to the purported license activity. Petitioners maintain that their 1979 license activity was "a trade or business or activity entered into for profit under Section 183 of the Internal Revenue Code." Petitioners maintain that the deductions claimed for 1979 represent expenses that were paid or incurred, and were ordinary and necessary. Finally, petitioners maintain that they were at risk with respect to the license activity because the notes signed by petitioners were negotiable. We agree with respondent as to the deductions. We agree with respondent's conclusion as to the at-risk issue. I. Deductions
These cases may be approached on the form level, focussing on the documents, the basic document being the license service agreement. These cases may also be approached on the substance level, focussing on what happened, in order to determine what was intended *282 to happen when the documents were executed. Each approach leads us to conclude that petitioners are not entitled to any of the deductions that they claim. Section 162(a)[15] allows a taxpayer to deduct the ordinary and necessary expenses of carrying on that taxpayer's trade or business. Section 212(1)[16] allows a taxpayer to deduct the ordinary and necessary expenses for the production of that taxpayer's income. Under both section 162 and section 212, a deduction is allowable only if the expense is "paid or incurred during the taxable year". Although petitioners executed promissory notes in 1979, there is no evidence in the record that payments were made on the notes in *283 1979 or that any other amounts were paid in 1979 for the expenses for which petitioners claimed a deduction for their Random Reports activity. Accordingly, to be allowed a deduction for 1979, petitioners must have "incurred" the expenses in 1979. Section 7701(a)(25) provides, in relevant part, that "incurred" is construed according to the taxpayer's method of accounting used in computing taxable income. In the instant cases all petitioners elected to use the accrual method of accounting for their Random Reports activity. Section 1.461-1(a)(2), Income Tax Regs., provides that Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. However, any expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year may not be deductible, or may be deductible only in part, for the taxable year in which incurred. * * * In the instant cases, each petitioner-couple assertedly became liable in 1979 under the license service agreements to pay $ 24,000 *284 to Random. The license service agreements provide that each petitioner-couple is to describe themselves as "Licensed Agent of Random Processing Services." Under these agreements, Cunningham/Curless and the Ropps are entitled to $ 1.00 for each account serviced by Random. In addition these agreements provide that certain training is available upon payment of specified amounts. The terms of these agreements, the use of the language "Licensee" and "Licensor" throughout the agreements, and the title of the document ("License Service Agreement"), lead us to conclude that the substance (if any) of these agreements is the conveyance, to petitioners by Random, of a license to conduct a business in a geographical area. These agreements provide that they will remain in force for 6 years and provide for renewals every 6 years thereafter at no cost to the licensees. It is clearly established that amounts paid to acquire licenses and franchises having a useful life of more than one year are capital expenditures and, accordingly, are not deductable as ordinary and necessary business expenses. P. Liedtka Trucking, Inc. v. Commissioner,63 T.C. 547, 555 (1975), and cases there cited; Nachman v. Commissioner,12 T.C. 1204 (1949), *285 affd. 191 F.2d 934 (CA5 1951). Compare South End Italian Club v. Commissioner,87 T.C. 168, 177 (1986). We conclude that petitioners are not entitled to deduct the full $ 24,000 for 1979. Such capital expenditures are, however, depreciable or amortizable over their useful lives. Petitioners do not contend, and there is no evidence in the record from which we could conclude, that the licenses have reasonably determinable useful lives. Without a reasonably determinable useful life, no depreciation or amortization deductions are allowable. Compare Westinghouse Broadcasting Co. v. Commissioner,36 T.C. 912 (1961), affd. 309 F.2d 279 (CA3 1962), with Indiana Broadcasting Corporation v. Commissioner,41 T.C. 793 (1964), revd. 350 F.2d 580 (CA7 1965). Petitioners must do more than establish a mere uncertainty as to renewal. Toledo TV Cable Co. v. Commissioner,55 T.C. 1107, 1124 (1971), affd. 483 F.2d 1398 (CA9 1973); Westinghouse Broadcasting Co. v. Commissioner,36 T.C. at 921. Also, the license service agreements appear to guarantee each petitioner-couple a return of at least $ 24,000 if the agreement is not renewed. Under these circumstances, although each petitioner-couple may *286 have a capital asset in which that petitioner-couple has a basis, it appears that there is not likely to be any cost that would appropriately be deductible or amortizable over the life of the license (that is, even if the license had a reasonably determinable useful life). R. E. Moorhead & Son, Inc. v. Commissioner,40 T.C. 704, 712-713 (1963). See Nachman v. Commissioner, 191 F.2d at 936. We conclude that none of the petitioner-couples is entitled to deduct for 1979 any part of the $ 24,000. Petitioners argue that the license fee was $ 1,000 and that the remaining $ 23,000 represented funds to be used for "advertising for a sales force." (See table 1, supra, for how petitioners treated the matter on their tax returns.) However, the license service agreements do not disclose this understanding. While Random did conduct some advertising, we conclude that no relationship exists between the entering into the license service agreements and associated promissory notes, and the advertising actually conducted. Petitioners do not incur expenses for advertising within the meaning of sections 162 and 212 merely by virtue of agreeing to pay Random the money due under the license service agreements. *287 In support of their position that a portion of the amount of the notes should be deductible as advertising, petitioners explain on answering brief as follows: The purpose of the note was to indicate to Random Processing Service that the money to fund advertising for a sales force would be available in the future. The amount that each of the Petitioners wanted to go into an advertising coop sponsored by Random Processing, Inc. to fund either the sales force or an advertising campaign was determined by the Petitioners themselves. Even though they were part of an advertising coop, they could impact on the spending of the dollars since it was their decision as to what part of the coops money went for either media, advertising, or for a sales force. However, no evidence has been introduced which would indicate that debt undertaken by petitioners in 1979 ever resulted in advertising or any other specific expenditure. We note that none of the aggregate of $ 72,000 apparently owed by petitioners was paid to Random or put into any "advertising coop" in 1979, the year for which all petitioners claimed their deductions. Indeed, so far as we could tell, petitioners paid an aggregate of only *288 $ 24,000 to Random in 1980 and nothing in later years. Although Random or Marketing evidently did some advertising in later years, it does not appear that that advertising was funded by any contributions by petitioners to any "advertising coop". In general, the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. E.g., Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945); Estate of Schneider v. Commissioner,88 T.C. 906, 938 (1987), affd. 855 F.2d 435 (CA7 1988). In the instant cases, petitioners contend that the substance of the transaction was other than the transaction as represented by the agreements entered into evidence. Instead, petitioners contend that "at various times, the agreements between the parties were modified by each of the parties [sic] subsequent oral agreements." Two petitioners testified at the trial (see n. 2, supra); they seemed to be confused as to what agreements they had entered into with Random and Marketing. Monica and Robert testified; they were nonplussed on several occasions when the license service agreements or the marketing agreements conflicted with their descriptions of their relationships with *289 petitioners. We note, too, that the marketing agreements specifically provide that "Any modification of this Agreement or waiver of any provisions contained herein shall not be binding unless in writing and signed by both parties." Tables 5, 6, and 7 show Monica's summaries of the status of petitioners' operations as Random agencies. Monica charged each petitioner-couple an annual license fee of $ 1,000. However, the license service agreements drafted by Monica, do not authorize or provide for an annual license fee. None of the petitioners at any time objected to the imposition of this fee. If petitioners were truly engaged in this activity for profit, they would undoubtedly have objected to this unfounded charge. Monica's summaries indicate that petitioners had income in 1979, from their Random Report activity. Yet, no petitioner reported any income from this activity for 1979. Nor were the additional expenses charged to petitioners for 1979 reported as deductions in 1979. These differences between petitioners' 1979 tax returns and Monica's summaries are especially confusing because Robert's signature appears as tax return preparer for all three petitioner-couples' 1979 tax *290 returns. Monica's summaries indicate net losses for most years for petitioners. Monica indicated that the "net profit/loss" amounts represented cash flows for petitioners for the years indicated. Yet no money, except for the initial payments on the notes, ever passed between petitioners and Random. Monica's summaries indicate interest expenses for 1980 through 1984. The notes introduced into evidence expressly state they do not bear interest. Petitioners have not objected to these interest charges reflected in Monica's summaries, even though the lack of the interest charges would have resulted in apparent profits for most of the apparent loss years. The license service agreement entered into by Cunningham/Curless granted them an exclusive license to Cincinnati. Yet Random issued numerous other licenses for Cincinnati, and Cunningham/Curless have not objected to this apparent breach of contract. Petitioners contend that most of the amount of the notes represented deductible advertising expenses, totalling between $ 52,000 (see table 1, supra) and $ 69,000 (3 X $ 23,000 -- one of petitioners' contentions on brief), yet, there is little evidence of advertising and no evidence of *291 the cost of whatever advertising was done. Petitioners contend they were actively engaged in a trade or business, yet beyond signing the license service and marketing agreements (which the parties thereto claim to have disregarded on many points) petitioners did very little in the way of actual conduct of a trade or business. On answering brief, petitioners contend that the Ropps' $ 12,000 note "was payable either out of the proceeds of their business or upon demand by Random". Monica so testified. As the text of the note plainly shows (as set forth in the Findings of Fact, supra), the note becomes a demand note "In the event of non-payment of any principal or interest hereunder, when due". However, the note expressly provides for no interest, so there cannot be a "non-payment of * * * interest". The note plainly provides that principal is "payable from the proceeds of the business at 50%, which may be deducted by Random". Also paragraph 17 of the Ropps' license service agreement provides that the $ 12,000 "balance [is] to be paid by the proceeds of the business." (See n. 12, supra.) As a result, the only time that any principal is due, Random has complete control over the payment *292 of the principal. Accordingly, we conclude that petitioners have failed to show any practical circumstance under which the note could become a demand note; it clearly appears to be a nonrecourse note. Petitioner Lindley A. Ropp testified that he never acquired any clients for Random. Petitioner Charles Cunningham testified that "over a dozen and a half" of the people he sent to Robert "went with him". Yet Monica's summaries appear to show that Cunningham/Curless and the Ropps had precisely the same gross receipts, notwithstanding their substantially differing success in acquiring clients. Both Cunningham/Curless and the Brewers allocated substantial portions of their $ 24,000 to Management Fees or Managers Fee. (See table 1, supra.) Pursuant to the management agreements, Marketing was the manager. All the witnesses stressed that Marketing was separate from Random. Yet, the license service agreements provide that the entire $ 24,000 is to be paid to Random. This leaves nothing of the $ 24,000 to be paid to Marketing for management fees. The management agreements provide for management fees to come out of business earnings, not out of the $ 24,000. In the instant cases, the confusion *293 surrounding the substance of the transactions is so great as to appear to be a hopeless maze of deceit. We are reminded of the following statement made by the Court of Appeals for the Seventh Circuit in Saviano v. Commissioner,765 F.2d 643, 654 (CA7 1985), affg. 80 T.C. 955 (1983): The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future. We hold for respondent on this issue. [17] *294 II. Section 6621(c)
Section 6621(c)[18] *295 provides that, if a substantial underpayment is attributable to a tax motivated transaction, then the interest rate on that underpayment is 120 percent of the regular underpayment interest rate. [19] One such category of tax motivated transaction is a loss disallowed by reason of section 465(a). Under section 465(a), [20] *296 *297 a taxpayer is not permitted to deduct a loss from an activity for a year in excess of the amount that taxpayer has at risk (with respect to that activity for that year). Although it is not specifically stated by the parties, we gather that their basic dispute as to the effect of paragraph 26 of the license service agreements (see n. 13, supra) regards section 465(b). [21]
Paragraph 26 of the license service agreement specifically requires "the Licensor" -- Random -- to "buy back the area" for not less than $ 24,000 "If this Agreement is not *298 renewed". That paragraph also specifically states that "The Licensee [each petitioner-couple] has the total and full option to renew the license status every six (6) years". Neither side contends that Random could require a petitioner-couple to renew the agreement. We conclude that the effect of these provisions is that each petitioner-couple has the opportunity, every 6 years, to not renew the agreement and thereby to require Random to pay at least the $ 24,000 original purchase price. Although Random will have had the use of the money in the meanwhile, petitioners do not contend that we should take into account the time value of money in determining the amount by which each petitioner-couple's obligation is to be reduced. See Follender v. Commissioner,89 T.C. 943, 949-955 (1987), in which we rejected respondent's contention that we should reduce a taxpayer's at-risk amount because the taxpayer would not have to pay this amount until a future date. We conclude that, even apart from the nonrecourse nature of part of each petitioner-couple's obligation to Random, the right of return granted by paragraph 26 of the license service agreement results in each petitioner-couple's not *299 having any amount at risk, under section 465(b)(4). Petitioners contend, and their witnesses testified, that they understood paragraph 26 to operate otherwise. We have commented, supra, on the significant number of occasions in which the testimony of petitioners' witnesses seems to conflict with the documents created by Monica and Robert, and signed by petitioners. We have doubts about the truthfulness of some of the testimony and also doubts about the truthfulness of some of the documents. Petitioners' claims for 1979 deductions rest entirely on the validity of the obligation of each petitioner-couple to $ 24,000 to Random, and those obligations arose only under the license service agreements. Under these circumstances, we resolve the dispute as to Random's obligations to repay, by coming down on the side of the license service agreements' statement of Random's obligations. The effect of our conclusion that petitioners did not have any amounts at risk for their Random Reports activities at the end of 1979 is to disallow any deductions from these activities for 1979. (Sec. 465(a).) Disallowance of these deductions produces the entire deficiencies in the instant cases. Accordingly, *300 we conclude that the entire deficiencies are underpayments attributable to tax motivated transactions. (Sec. 6621(c)(3)(A)(ii).) Respondent has conceded that we might well avoid examining the at-risk rules of section 465 but for the fact that he has raised the matter in his contention that petitioners are liable for increased interest under section 6621(c). Respondent is correct; it was not necessary for us to consider section 465 in order to determine petitioners' deficiencies. On the deductions issue, we held that petitioners' investments in the licenses must be capitalized. We then held that petitioners are not entitled to deduct any part of these capitalized investments for 1979 because (1) they have failed to show that there was any reasonably determinable useful life for the licenses and (2) the license service agreements' refund provisions leave no net cost to be amortized. In concluding, supra, that the license service agreements had, in effect, no net cost, we considered that the repayment provisions of paragraph 26 precluded petitioners from incurring any cost that they could depreciate or amortize. Our analysis of the nonrecourse or "stop loss" (see sec. 465(b)(4)) *301 nature of paragraph 26 of the license service agreements is "inseparable" from our analysis of the deduction issue. McCrary v. Commissioner, 92 T.C. (April 17, 1989). We hold for respondent on this issue. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Lindley A. and Sharon K. Ropp, docket No. 18672-83; and Estate of Gerald A. Brewer, Janet D. Brewer, Executrix and Janet D. Brewer, docket No. 24602-83.↩
2. Immediately before the start of the trial, respondent's counsel raised a question about possible conflict of interest regarding petitioners' counsel. Two of the petitioners, Charles Cunningham and Lindley A. Ropp, were in the courtroom at the time. The Court discussed the matter on the record, pointed out to these petitioners that there was such a theoretical possibility, and then stated as follows: And The Court wants to bring it to your attention, make sure that you understand that theoretical possibility, and then I want to ask you to state on the record whether you are waiving any rights to say that you're not being properly represented, that you need different counsel and whether you are willing to proceed with the trial at this point under these circumstances. Both of these petitioners then stated that they understood the situation and stated that they were willing to let their counsel continue to represent them in these cases.↩
3. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue; references to section 6621↩ are to that section of the Internal Revenue Codes of 1954 and 1986 as in effect for periods after December 31, 1984.
4. Section 6621(d) was redesignated section 6621(c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. 5. Petitioners Brewer do not dispute the addition to tax under section 6651(a)(1)↩, except insofar as a reduction in the deficiency determined against them would reduce or eliminate this addition to tax.
6. Rule 151(e)(3) provides as follows: RULE 151. BRIEFS * * * (e) Form and Content: All briefs shall contain the following in the order indicated: * * * (3) Proposed findings of fact (in the opening brief or briefs), based on the evidence, in the form of numbered statements, each of which shall be complete and shall consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law. In each such numbered statement, there shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement. In an answering or reply brief, the party shall set forth his objections, together with his reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which his objections are directed; in addition, he may set forth alternative proposed findings of fact. In the instant case, the parties filed simultaneous briefs. In violation of Rule 151(e)(3), petitioners' opening brief does not include proposed findings of fact; their answering brief does include proposed findings of fact, but does not include responses to respondent's proposed findings of fact. As a result, respondent was deprived of the opportunity to respond to petitioners' proposed findings of fact. Under the circumstances, we have assumed that (1) petitioners do not object to respondent's proposed findings of fact except to the extent that petitioners' proposed findings of fact are clearly inconsistent therewith, and (2) respondent does object to petitioners' proposed findings of fact except to the extent that respondent's proposed findings of fact are clearly consistent therewith. We note that, in 15 of petitioners' 29 proposed findings of fact, petitioners' counsel further violated Rule 151(e)(3) by failing to insert "references to the pages of the transcript or the exhibits or other sources relied upon to support" those proposed findings of fact. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.↩
7. After the petition was filed in docket No. 24602-83, but before the trial, Gerald A. Brewer died and his estate was substituted as a petitioner.↩
8. The agreement provides, in pertinent part, as follows: 6. The Licensee may, if he/she wishes, directly solicit business for the Random Processing System(s) in his/her territory. The Licensor [Random] requires, however, that the Licensee maintain the guidelines, quality standards and operating procedures of the Licensor. The Licensor is under no financial responsibility to pay or reimburse the Licensee for any sales efforts affected by the Licensee in his/her territory. 7. The Licensee is restriced [sic] from: a) any "pyramid" type of marketing system b) any change in the name of the product c) any change in the trademark d) any change in the color of the manuals, brochures, letterhead, or any and all of the operational materials and supplies.↩
9. The license service agreement provides, in pertinent part, as follows: 8. * * * Licensor will pay over to the Licensee One Dollar ($ 1.00) for each of the accounts processed through the Do-It-Yourself, single entry system [sic], per report processed. That is to say, if the Licensee has three accounting firms using the Random System in his/her territory and each firm had fifty (50) accounts and all of these accounts processed monthly, the Licensee would receive One Hundred and Fifty Dollars a month or Eighteen Hundred Dollars per year as an override on that amount of business. The Brewers' license service agreement differs from Cunningham/Curless' and the Ropps' in that the Brewers were not entitled to $ 1 from each account, but were entitled to the entire "set-up fee" (initially, $ 55) and to 25 percent of the processing fee from every account that was brought in by the Brewers or assigned to them on a rotating basis.↩
10. The licensee service agreement provides, in pertinent part, as follows: "10. Licensor gives exclusive right to the Licensee for his/her defined area." Nevertheless, (1) Cunningham/Curless' agreement shows their area as "Cincinnati, Ohio"; (2) the Ropps' agreement shows their area as "the City of Cincinnati (non-exclusive)"; (3) the Brewers received similar "rights" to Cincinnati; and (4) Random entered into at least five other license service agreements for Cincinnati.↩
11. The license service agreement provides, in pertinent part, as follows: 15. The Licensee shall not hold himself/herself out as an employee, legal representative, partner, subsidiary or joint venturer of Random Processing Services. The Licensee shall have no right or power to and shall not bind or obligate Random Processing Services or any of its asignees [sic] in any way, manner or thing whatsoever, nor represent that he/she has any right to do so. In all public records and in his relationship with other persons, on all advertising and promotional materials, letterhead, business forms, business cards and financial reports, Licensee is to state, "Licensed Agent of Random Processing Services." 16. Licensor shall in no way bind or obligate the Licensee, or any of its assignees in any manner other than a note that may be an addendum to this instrument. The Licensee is in no way responsible for the actions of the Licensor.
12. The license service agreement provides, in pertinent part, as follows: 17. Licensee hereby accepts all of the terms, covenants and conditions of Random Processing Services and agrees to perform all of the requirements thereof as they apply to the Licensee. More particularly, Licensee agrees to pay The signing of the agreement acknowledges that the Licensee is indebted, to the extent mentioned above, to the Licensor for the purpose of ordinary business expenses. In the Cunningham/Curless agreement, the blank is filled in as follows: "TWENTY-FOUR THOUSAND DOLLARS AND NO CENTS". In the Ropps' agreement, the blank is filled in as follows: "Twenty-Four Thousand ($ 24,000.00) $ 6,000.00 due no later than February 15, 1980 and $ 6,000.00 due by March 15, 1980 balance to be paid by the proceeds of the business."↩
13. The license service agreement provides, in pertinent part, as follows: 26. The term of the License Service Agreement shall commence on the date of execution of this agreement and shall remain in force for six (6) years. The Licensee, his/her heirs or assigns, has the total and full option to renew the license status every six (6) years thereafter at no additional cost. The Licensee will be given notice by certified mail, not less than sixty (60) days and not more than ninety (90) days prior to the anniversary date. Notwithstanding, the License shall remain in effect until such proper notice is communicated to the License Holder. If this Agreement is not renewed, the Licensor or its assigns must buy back the area defined as [Cincinnati] for a sum equal to twelve (12) times the total fees earned by the Licensee in the final month of the Agreement from processing services or the original purchase price of [$ 24,000], whichever is greater.↩
*. [Underscored material is typed onto the printed form, except for the signatures, which are handwritten; x's are typed over the printed words "with interest".]↩
14. The management agreement provides, in pertinent part, as follows: 5. Fees to Manager. In consideration for Manager's [Marketing's] agreement to perform the services of manager during the term of this Agreement, Owner [petitioner-couple] shall permit Manager to earn commissions in the area known as    It is fully understood that the State License Holder (Owner) is not liable to pay said commissions. In the Ropps' management agreement, the blank is filled in with "City of Cincinnati, Non-exclusive". In Cunningham/Curless' management agreement, the blank is filled in with "CINCINNATI, OHIO".↩
15. Section 162(a) provides, in pertinent part, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * ↩
16. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production * * * of income;↩
17. Robert figured in our recent opinion in Rybak v. Commissioner,91 T.C. 524 (1988). We note that the Ropps also were petitioners in Rybak (91 T.C. at 572) and that petitioners' counsel in the instant cases also represented the taxpayers in Rybak (see nn. 2 and 6, supra). Our findings and opinion in the instant cases are based on the record herein and are not affected by the opinion in Rybak.↩
18. Section 6621(c) provides, in pertinent part, as follows: SEC. 6621. DETERMINATION OF RATE OF INTEREST. * * * (c) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this section. * * * (3) Tax motivated transactions. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transaction" means -- * * * (ii) any loss disallowed by reason of section 465(a) * * * (4) Jurisdiction of Tax Court. -- In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions. [This text takes into account amendments made by sec. 1511(c)(1) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744.] ↩
19. The additional interest applies to interest accrued for periods after December 31, 1984, even though the disputed deficiencies are for 1979. Solowieiczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005↩ (CA2 1986). 20. Section 465 provides, in pertinent part, as follows: SEC. 465. DEDUCTIONS LIMITED TO AMOUNT AT RISK. (a) Limitation to Amount at Risk. -- (1) In general. -- In the case of -- (A) an individual, * * * * * * engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year. * * * (b) Amount Considered at Risk. -- (1) In general. -- For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including -- (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2)). (2) Borrowed amounts. -- For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he -- (A) is personally liable for the repayment of such amounts, or * * * (4) Exception. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. * * * (c) Activities to Which Section Applies. -- (1) Types of activities. -- This section applies to any taxpayer engaged in the activity of -- (A) holding, producing, or distributing motion picture films or video tapes, (B) farming (as defined in section 464(e)), (C) leasing any section 1245 property (as defined in section 1245(a)), (D) exploring for, or exploiting, oil and gas resources, or (E) exploring for, or exploiting, geothermal deposits (as defined in section 613(e)(3)) as a trade or business or for the production of income. * * * (3) Extension to other activities. -- (A) In general. -- In the case of taxable years beginning after December 31, 1978, this section also applies to each activity -- (i) engaged in by the taxpayer in carrying on a trade or business or for the production of income, and (ii) which is not described in paragraph (1).↩
21. We note that, by invoking section 465, respondent may be regarded as having implicitly conceded that petitioners' Random activities were engaged in as a trade or business, or for the production of income. See paragraphs (1) and (3)(A)(i) of section 465(c)↩.