ESTATE OF HAROLD FREDERIC STIMSON (DECEASED), EDITH S. O'TOOLE AND JULIA S. APPEL, PERSONAL REPRESENTATIVES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Stimson v. Commissioner
Docket No. 17152-89
United States Tax Court
T.C. Memo 1992-242; 1992 Tax Ct. Memo LEXIS 271; 63 T.C.M. (CCH) 2855; April 23, 1992, Filed *271 Decision will be entered under Rule 155. Held: Respondent's deficiency, to a substantial degree, sustained; respondent's additions to tax for fraud, under sec. 6653(b)(1) and ( 2), I.R.C., sustained in part. C. David Heisler, for petitioner. Deborah Y. Clark, for respondent. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By notice of deficiency dated April 14, 1989, respondent determined a deficiency in petitioner's Federal estate tax and additions to tax as follows: Additions to Tax
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
$ 96,136.62
$ 48,068.31
50% of interest
due on $ 96,136.62
The issues for decision are: (1) Whether certain bank accounts properly were excluded from the gross estate; (2) whether certain expenses claimed as deductions on Schedule J to the estate tax return properly were taken; and (3) whether all or any part of the underpayment is due to fraud. Certain items have been conceded by respondent while others have been conceded by petitioner. We deal here only with those items still at issue. All section references are to the Internal Revenue Code of 1954 in effect at the time of decedent's death and all Rule *272 references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Some of respondent's proposed findings of fact have been conceded by petitioner and, accordingly, are so found. [1] Those facts are incorporated herein by this reference. *273 Harold F. Stimson (decedent), died testate on February 25, 1985. His daughters, Edith Helen Stimson O'Toole (Edith) and Julia Anne Stimson Appel (Julia), were named personal representatives of the estate. At the time the petition herein was filed, Edith resided in Riderwood, Maryland, while Julia resided in Wittenberg, Wisconsin. Decedent was 94 years old when he died. He was a retired physicist. He resided at 2920 Brandywine Street, N.W., Washington, D.C. Edith and Julia were the sole heirs of decedent. Edith is a college graduate, with a Bachelor of Science degree in biological sciences from the University of Maryland. She also has done substantial post graduate university work. She has been employed in various laboratories as a microbiologist. Julia also is well educated; she is a nurse. Edward O'Toole (O'Toole) is Edith's husband. He is a Ph.D microbiologist; he is also a tax return preparer. He signed the estate tax return as preparer. Julia and Edith each signed as an executor. The estate tax return was timely filed. A United States Gift Tax Return, Form 709, was filed simultaneously. Money Market and NOW Accounts
At the time of his death, decedent maintained *274 two accounts with Riggs National Bank (the Riggs accounts). One was a money market account (the money market account), while the other was a NOW checking account (the NOW account). Decedent maintained the NOW account jointly with his wife until her death in 1977. Following his wife's death, and until 10 months prior to his own death, decedent maintained each account solely in his own name. Until his death, decedent reported all of the income from each account on his Federal income tax returns. Ten months prior to decedent's death, in April 1984, the names of Edith and Julia were added to the Riggs accounts. Their names were added as a convenience to decedent, so that, for instance, either might write checks to pay decedent's bills. Neither Edith nor Julia considered the money in either account to have been received by her as a gift or to be hers to use as she willed. From the time their names were added to the Riggs accounts in April 1984 until November 1984, Edith and Julia wrote checks on the Riggs accounts, but only for the benefit of decedent. On October 31, 1984, the balance in the money market account was $ 136,232.72. The November-December "Gifts"
On November *275 10, 1984, Edith wrote a check on the money market account, payable to Julia, in the amount of $ 56,000. That check was deposited to the NOW account. During November and December 1984, Edith and Julia wrote checks totaling $ 56,000 on the NOW account, to various members of their families, as follows: Check No.
Date
Drawn By
Payee
Relationship
Amount
692
11/13
Edith
Raymond W.
Julia's son
$ 5,000 Appel
693
11/13
Edith
George D.
Julia's son
5,000
Appel
694
11/13
Julia
Edith
Sister
10,000
695
11/13
Julia
Hope O.T.
Edith's
5,000
Kirk
Daughter
696
11/13
Julia
Eugene S.
Edith's son*
8,000
O'Toole
697
11/13
Edith
E. Thomas
Edith's son*
8,000
O'Toole III
701
11/26
Edith
Julia
Sister
10,000
705
12/17
Edith
Janet A.
Julia's
5,000
Snyder
Daughter
$ 56,000 Prior to November 1984, decedent had made numerous gifts to many of the same members of his family. Those gifts ranged in size from $ 500 to $ 7,000. The Fairfax Account
On December 24, 1984, Julia wrote a check on the NOW account, payable to Edith, in the amount of $ 75,000, which check was signed by decedent. *276 That sum was deposited in a newly opened money market account at Fairfax Savings Association, a Maryland institution (the Fairfax account). The Fairfax account was opened because the amounts in the Riggs accounts exceeded Federal Deposit Insurance Corporation insurance limits for those accounts. The Fairfax account was opened in the names of Julia, Edith, and decedent. Decedent, however, never executed a signature card for that account. Edith did not consider the Fairfax account to be her account, from which she could write her personal checks. As with the Riggs accounts, she considered her name to be on the account merely for the sake of convenience. It never occurred to Edith or Julia that decedent's failure to execute the signature card would mean decedent did not own the account. Decedent would have executed the signature card if he had thought failure to do so would have precluded him from being considered owner of the Fairfax Account. On the date of decedent's death, the balance of the Fairfax account was $ 76,139.46. No portion of that balance was reported on the estate tax return. The Schedule K Gifts
On Schedule K to the estate tax return ("Debts of the *277 Decedent, and Mortgages and Liens"), an item, "Financial Gifts Given as New Years Present", appears as a debt of the estate, in the amount of $ 40,000. A notation, "Check Cleared After Death" accompanies that item. The item in question represents four checks, drawn on the NOW account and numbered 797, 798, 799, and 800. Each such check is dated January 14, 1985, and each is in the amount of $ 10,000 (the $ 10,000 checks). The payees of the $ 10,000 checks are, respectively, Julia, David Appel (Julia's husband), Edith, and O'Toole. Julia wrote and signed the $ 10,000 checks. No entries corresponding to the $ 10,000 checks appear in the check register for the NOW account. That register does record three checks drawn on the NOW account on January 14, 1985. Those checks are numbered 716, 717, and 719. Julia wrote the check register entries for those checks. Check number 796, whose number immediately proceeds that of the first of the $ 10,000 checks, is dated September 13, 1985. It is entered in the NOW account check register out of order, between entries for checks numbered 758 and 759. During decedent's life, the NOW checkbook was kept in a desk drawer in decedent's house. *278 Insufficient funds were on deposit in the NOW account to cover the $ 10,000 checks. The $ 10,000 checks never were delivered or cashed, and both Edith and Julia were aware of that fact. A gift tax return was filed simultaneously with the estate tax return. The $ 10,000 checks are the only gifts shown on the gift tax return. Each check is listed separately, with the payee and his or her relationship to decedent set forth. Petitioner has conceded that the $ 10,000 checks are not deductible as debts of the estate. Following decedent's death, Edith and O'Toole took possession of all of decedent's bank accounts, including his checks and bank statements. Edith and Julia retained an attorney (later dismissed) to represent petitioner, whom they told that the $ 10,000 checks had not been cashed. During respondent's examination of the estate tax return, respondent's agent, estate tax attorney John Pirri (Pirri), asked for documentation of the gifts made by way of the $ 10,000 checks. In a letter to Pirri, O'Toole took the position that it was unnecessary for him to provide the canceled checks as documentation for such gifts. He also stated that the $ 10,000 checks were unavailable, *279 "as the bank does not return checks." During a meeting with Pirri, O'Toole produced a photocopy of the fronts of the $ 10,000 checks, and he stated that such checks cleared after decedent's death. Schedule J Expenses
Decedent's only assets at the time of his death were his house, the furnishings therein, which had a minimal value, stocks and bonds with a value of $ 234,546 and the bank accounts previously discussed. Approximately 8 months after his death, decedent's house was sold for $ 330,000. Schedule J expenses in dispute are as follows: Expense
Account
Executors' Commissions
$ 57,650
Payment to Register of Wills
550
Expenses of Selling Decedent's
Residence  23,715
Expenses of Personal Representatives
of the Estate  7,216
Expenses of Maintaining Decedent's
Residence  400
Expenses of "House Sitting"
Decedent's Residence  150
Security & Surveillance Expenses
re: Decedent's Residence  1,550
Gas Bill re: Decedent's Residence
465
Telephone Bill
812
Trash Removal re: Decedent's Residence
246
Death Certificate
70
Postage
69
Miscellaneous
460
$ 93,353
The attorney initially retained to represent petitioner advised Edith and Julia of the necessity *280 of being able to account for their expenditures in connection with the estate. Edith and Julia were advised to retain receipts to account for their expenditures. The $ 57,650 claimed as executors' commissions were never paid to Edith or Julia. O'Toole prepared the estate tax return. O'Toole reported the $ 57,650 executors' fee on a partnership return for a partnership in which he and his wife were partners. ULTIMATE FINDING OF FACT Petitioner understated the amount of Federal estate tax required to be shown on the return by claiming a deduction, as a debt of the estate, for the $ 10,000 checks; the resulting underpayment is due to fraud. OPINION Approximately 10 months prior to his death, decedent added the names of Edith and Julia to two bank accounts that he maintained at Riggs National Bank. Edith's and Julia's names were added as a convenience to decedent, and neither Edith nor Julia considered decedent to have transferred any portion of either account as a gift. Subsequently, a third account, the Fairfax account, was opened by transferring funds from one of the Riggs accounts (the money market account). Petitioner excluded two-thirds of the Riggs accounts and all of *281 the Fairfax account from decedent's gross estate. It is respondent's position that all three accounts belonged in full to decedent, and each should have been included in full in decedent's gross estate. In the months preceding decedent's death, Edith and Julia, who claim they acted at the direction of decedent, transferred funds totaling $ 56,000 to themselves and their children. Respondent claims that Edith and Julia were without authority to make such gifts. Respondent challenges numerous administrative expenses claimed by petitioner on the grounds that such expenses were not adequately substantiated or petitioner failed to show the reasonableness or necessity of making such expenditures. Finally, respondent maintains that the pattern of behavior of Edith, Julia, and O'Toole, preparer of the estate tax return, was such as to justify imposition of the addition to the tax for civil fraud. We will deal in turn with each of the issues presented. Exclusion of All or a Portion of the Bank Accounts
Petitioner would exclude two-thirds of the Riggs accounts from decedent's gross estate on the theory that, for some period preceding his death, Edith had allowed her father to *282 deposit coupon bond interest into those accounts, which bond interest, she claims, belongs to her. On brief, petitioner concedes that the total amount of such bond interest deposited to the joint accounts is not ascertainable. Under section 2040(a), the gross estate includes the value of property held jointly at the time of decedent's death by decedent and another person with right of survivorship. The entire value of such jointly held property is included except to the extent that a portion can be attributed to consideration furnished by such other person. See sec. 20.2040-1(a), Estate Tax Regs. Petitioner has the burden of proving the extent of the consideration furnished by the surviving joint owner. Id.; Rule 142(a). Edith's vague testimony concerning certain coupon-bearing securities, jointly inherited by her and decedent, the coupons from which were cashed and deposited in the Riggs accounts, is insufficient to carry petitioner's burden of proof. Accordingly, each of the Riggs accounts will be included in full in the gross estate. Sec. 2040; see Estate of Di Palma v. Commissioner, 71 T.C. 324, 328 (1978); Estate of Cobb v. Commissioner, T.C. Memo. 1982-571; *283 Estate of Magill v. Commissioner, T.C. Memo. 1982-148. With regard to the Fairfax account, petitioner's argument is somewhat different. Petitioner argues that, since decedent never signed a signature card with regard to that account, decedent was not a joint owner thereof. Petitioner cites Federal Deposit Insurance Corporation regulation 330.9(c) and the Annotated Code of Maryland, Tax-General, art. 7-209(a). Petitioner therefore maintains that, under section 2033, the Fairfax account should be excluded from the gross estate, because decedent had no interest therein. Petitioner misperceives the scope of section 2033. In full, that section reads: "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Although, for Federal deposit insurance purposes, decedent may not have had an ownership interest in the Fairfax account, it is clear that section 2033 reaches property beneficially owned by decedent. See sec. 20.2033-1, Estate Tax Regs. [2] It is uncontested that Edith's and Julia's names were added to the NOW account as a convenience to decedent and that no gift *284 of any of decedent's funds in that account was intended. The funds in the Fairfax account were transferred from the NOW account without the intent to change the beneficial ownership thereof. Thus, even if any joint tenancy with decedent in those funds was severed upon their withdrawal from the NOW account (a proposition that we doubt), decedent still retained a beneficial interest in those funds sufficient to require inclusion of all of those funds in the gross estate. Petitioner's alternative argument that Edith was a contributor to that account fails for the same reason that that argument failed with regard to the Riggs accounts. The November-December "Gifts"
On November 10, 1984, Edith transferred $ 56,000 from the money market account to the NOW account. Thereafter, in November and December 1984, Edith and Julia wrote $ 56,000 in checks to themselves *285 and their children. There is no evidence other than the testimony of Edith and Julia that decedent authorized the gifts in question. Although decedent had some history of making family gifts, there is no one year in which he had made total gifts approaching $ 56,000. Decedent consistently had made gifts to his daughters. Although he had made gifts to his granddaughters, in the 5 years preceding his death, only one gift, of $ 3,000, in 1983, had been made to each of Julia's two sons; at no time had he made gifts to Edith's sons. Thus, decedent's pattern of making gifts does not fit the "gifts" in question. Edith and Julia are not unintelligent women. They were decedent's only heirs. The "gifts" in question were made to them and to their children. We cannot help but conclude that they were aware of the estate tax benefits of those transfers (and of the $ 10,000 "gifts"). Decedent, of course, is not alive to confirm any instructions he might have given to Edith and Julia. Nevertheless, petitioner has offered nothing to support Edith's and Julia's testimony. Did not one of his grandchildren thank decedent? Perhaps they failed to write, but their recollections as to conversations *286 with decedent would have been helpful. One inconsistency in decedent's conduct is also troubling. On November 10, 1984, there was a transfer from the money market account to the NOW account, apparently preparatory to making the claimed gifts in question. That transfer was by check, in the amount of $ 56,000, written by Edith and payable to Julia. Approximately 1 month later, on December 24, 1984, a check was drawn on the NOW account, payable to Edith, in the amount of $ 75,000, to open the Fairfax account. That check was signed by decedent. It is consistent with the addition of Edith's and Julia's names to the two Riggs accounts, as a convenience to decedent, that Edith and Julia would write small checks, for everyday household expenses and, perhaps, for small gifts. Decedent's signature on the check used to open the Fairfax account is indicative that decedent, at least in one instance, exercised stronger control over large transfers. When added to the lack of collateral corroboration of Edith's and Julia's testimony regarding decedent's directions as to the "gifts" in question, that inconsistency leads us to question seriously the veracity of Edith's and Julia's testimony. *287 We conclude that petitioner has failed to carry its burden of proving that decedent authorized the "gifts" in question. Petitioner has not argued that, failing to demonstrate that decedent made the "gifts" in question, it would not have a claim against the recipients of such "gifts" (or against Edith and Julia), the value of which claim would be includable in the gross estate. See sec. 2033. Accordingly, we determine that the value of the gross estate must include the value of the November-December "gifts". Schedule J Expenses
Expenses of administration are deductible in determining the taxable estate. See sec. 2053. The $ 57,650 claimed on the estate tax return as "executors' commissions" were never paid to Edith or Julia. O'Toole prepared the estate tax return. O'Toole reported the $ 57,650 on a partnership return for a partnership in which he and his wife were partners. On brief, petitioner appears to claim that such amount was an allowable accounting fee paid to O'Toole. O'Toole testified that, in preparing the estate tax return, he fixed the executors' commission at 10 percent of the gross estate, based on his inquiries as to what a normal or fair executors' *288 fee would be in the metropolitan Washington, D.C., area. The amount claimed by O'Toole, although apparently taken into account on his partnership return, was never paid by the estate. Miscellaneous administration expenses, including accountant fees are deductible under section 2053 to the extent they are actually and necessarily incurred in the administration of decedent's estate. Sec. 20.2053-3(a) and (d), Estate Tax Regs. Petitioner has not carried its burden of showing that the amount now claimed as accountant's fees was actually and necessarily incurred in the administration of decedent's estate. O'Toole testified that the charge was a fixed fee, based on a percentage of the estate. When asked to explain how his services should have been billed, if, indeed, they were accountant's fees, O'Toole's testimony was imprecise. He offered no testimony as to his usual hourly fees for return preparation. When asked the number of hours he worked on the estate tax return, he responded that he had worked perhaps 1,000 hours over a 6-month period. That is an incredible amount of time, given the relative simplicity of decedent's estate, which, in the main, consisted of a residence and *289 certain marketable securities. It works out to about 25 40-hour weeks, and that from a man otherwise employed. We do not doubt that O'Toole prepared the estate tax return in question and that he spent some time and expended some effort in doing so. Apparently he was in the business of preparing tax returns, although he had never prepared an estate tax return prior to preparing the return for petitioner. On Schedule J, petitioner claimed a deduction of $ 4,000 for attorney's fees, paid to the attorney initially retained to advise petitioner and prepare the estate tax return. Respondent has conceded the deductibility of that amount. That attorney prepared draft returns for petitioner, which were not acceptable for reasons that are not clear. We will use expenses incurred in connection with that attorney as a bench mark in determining reasonable and necessary compensation to Edward O'Toole for return preparation services. Given his inexperience in estate tax preparation, and the benefit that undoubtedly he got from the draft attorney-prepared returns, we will allow petitioner a deduction equal to one-half the expense incurred as attorney's fees. Thus, we will allow a deduction *290 in the amount of $ 2,000. On Schedule J, a deduction is claimed for a payment to "Register of Wills" in the amount of $ 550. It has been stipulated by the parties that a check in the amount of $ 525 was written to the register of wills. Accordingly, a deduction is allowed in that amount. In her reply brief, respondent has conceded that petitioner is entitled to a deduction for the expenses of selling decedent's residence. Accordingly, such deduction is allowed. Petitioner fails to offer adequate substantiation of its deduction of $ 7,216 as expenses of its personal representatives. Although Julia claims to have made four airline trips to Washington, no evidence was offered as to the dates of travel and no documentary evidence in the nature of tickets or checks was offered to substantiate the alleged payments. Travel to Washington prior to her father's death clearly is not a deductible expense on the estate tax return. Other expenses claimed were not adequately substantiated. Moreover, it was not shown that such alleged expenditures were essential to the proper settlement of the estate and not incurred for the individual benefit of its heirs. See sec. 20.2053-3(a), Estate *291 Tax Regs. However, since it is obvious that some necessary expenses were incurred by the administrators of the estate, and we have found that Edith and Julia received no executors' commissions, we will allow $ 2,000 each as expenses actually and necessarily incurred in the administration of the estate. A Schedule J deduction in the amount of $ 1,550 was claimed for security and surveillance of decedent's residence. Testimony as to any security and surveillance with regard to the residence was vague. Security and surveillance was provided by a company owned by Edith's daughter and son-in-law. There was no testimony that amounts billed by that company were ever paid. No checks were offered to substantiate payments of those amounts. Petitioner has failed to carry its burden of proving that any expense was incurred. No deduction will be allowed. The remaining Schedule J amounts in dispute are for various sums, none exceeding $ 850. In total such expenses amount to $ 2,672. Petitioner has failed to substantiate those expenses. However, because it is apparent that at least some of those expenses were incurred, e.g., for telephone and gas service at decedent's residence, we will *292 allow a deduction of $ 1,500. Fraud Addition
Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); Estate of Wheeler v. Commissioner, T.C. Memo. 1978-15. The determination of fraud is primarily a question of fact to be resolved from an analysis of the entire record. Stratton v. Commissioner, 54 T.C. 255 (1970); Estate of Pittard v. Commissioner, supra.The fraud meant is actual, intentional wrongdoing and the intent required is the specific purpose to evade a tax believed to be owing. Estate of Pittard v. Commissioner, supra at 400. Although pointing at many aspects of Edith's and Julia's conduct in connection with the estate tax return, respondent primarily contends that petitioner defrauded the Government by taking a deduction on the estate tax return for the $ 10,000 checks. In its opening brief, petitioner has requested no specific findings of fact relating to the fraud addition other than that petitioner relied on O'Toole to prepare the return and represent *293 it. In its reply brief, petitioner argues that the deduction of the $ 10,000 checks resulted from a simple miscommunication between its personal representatives (Edith and Julia) and O'Toole and that in all other aspects petitioner acted legitimately. Moreover, to the extent that it improperly claimed any deductions, or omitted assets from the gross estate, petitioner claims that its personal representatives misunderstood the law. Petitioner has conceded that the $ 10,000 checks are not deductible. Petitioner has conceded that, although the estate tax return bears the notations "Check Cleared After Death", the checks never were cashed and, in fact, never cleared the bank. Furthermore, despite the fact that a gift tax return was filed listing separately the four $ 10,000 checks, those checks never were delivered to the donees. Edith and Julia have admitted that, at the time they claimed the checks were written, funds in the NOW account were insufficient to pay the $ 40,000. Edith and Julia have also admitted that they were aware that the $ 10,000 checks never were delivered or cashed. All of the above is not logically inconsistent with the return preparer's mistakingly deducting *294 the checks on the estate tax return, either because he did not know that they had not been delivered or cashed or because he misunderstood the law. However, we do not believe that to be the case. Edith and Julia knew that the $ 10,000 checks never were cashed, knew that the $ 10,000 checks were taken as a deduction on the estate tax return (and listed on the gift tax return), and yet they permitted those checks to be so deducted on the estate tax return (and listed on the gift tax return). We believe they did so with the fraudulent intent to avoid tax. That fraudulent intent is attributable to petitioner. Edith's and Julia's Story
Julia claims to have written and signed the checks at the direction of decedent and to have left them, undelivered, in decedent's house, where they remained until his death. The checks then came into the possession of Edith and O'Toole and were delivered to the attorney retained (and later dismissed) by petitioners. Edith claims that the checks never were returned by the attorney. She claims, however, that she had the presence of mind to make a photocopy of the fronts of the checks (but not the backs, since they never had been cashed) before *295 she delivered them to the attorney. O'Toole admits that he prepared the tax returns in question without having the checks themselves, but only a photocopy of their fronts, which photocopy he concludes must have been made by Edith. He testified that he deducted the checks as debts of the estate on Schedule K and wrote "Check Cleared After Death" because he assumed that there had been insufficient time for them to clear before decedent's death and because both Edith and Julia had told him that the checks had cleared. At trial, Edith, Julia, and O'Toole agreed that there had been a misunderstanding and that Edith had thought he was referring to the $ 56,000 of gift checks written in November and December of the year before decedent's death. Although the scenario described by Edith and Julia is not impossible, we have serious doubts that the scene played out as described. Edith's and Julia's Testimony
We find incredible both Edith's and Julia's testimony concerning the estate and gift tax reporting of the $ 10,000 checks. Julia would have us believe that she examined the estate tax return but missed the entry on the Schedule K deducting $ 40,000 for "Financial Gifts Given as *296 New Years Present", and annotated: "Check Cleared After Death". The annotation is clearly erroneous, and there is no doubt that Julia knew that the $ 40,000 checks did not clear. She has not claimed that she saw the entry but confused the reference to "Financial Gifts" with the $ 56,000 in gifts allegedly made in November and December. She also has not claimed that she saw the entry but did not realize what it was. If she saw it, we must conclude that she chose to ignore the erroneous annotation: "Check Cleared After Death". We believe that she saw it. In response to the Court's questions as to whether she examined and signed the estate tax return, Julia testified that she had gone over it in detail, examining all the schedules and all the entries. We believe that she went over it in such detail that she must have detected the erroneous annotation concerning the $ 10,000 checks. That annotation was a factual assertion, and she did not need to know anything about the tax law to know that that annotation was incorrect. We believe that she went over the return in sufficient detail because, apparently, it was that type of detail that caused petitioner's attorney to be dismissed. *297 Julia testified that that attorney pressured her to sign the estate tax return prepared by him before she had sufficient time to review it and that, in prior drafts, she had found inconsistencies and errors, which she brought to his attention. Julia would not have missed a $ 40,000 misstatement on a return prepared by her-brother-in law, who had never before prepared an estate tax return. We conclude that Julia saw, but fraudulently chose to ignore, the annotation: "Check Cleared After Death", accompanying the entry for the $ 10,000 Checks on Schedule K to the estate tax return. That fraud is attributable to petitioner. Edith's testimony concerning the gift tax return filed simultaneously with the estate tax return also is incredible. The only items on that return are four checks, listed separately, one each to Julia, Edith, O'Toole, and Julia's husband, each in the amount of $ 10,000. Edith reviewed the gift tax return before it was filed and testified that she saw the listing of those four checks. She responded as follows to the question: You knew those checks weren't cashed? I didn't think about it at that time. It had been a long time since the checks had been written *298 before this was filled out. I knew that the checks had been written, I knew that at the time there was not money in the account to cover them, that money would have to be transferred. In truth, the time interval between the claimed date of the checks, January 14, 1985, and the date the gift tax return was filed, May 1, 1986, is less than 16 months. At some point in that interval, Edith and Julia had informed the attorney initially hired by them that the checks had not been cashed. Also, Edith testified that decedent never made any other $ 10,000 gifts to either O'Toole or Julia's husband with which she could have been confusing the checks in question. Simply put, we do not believe Edith's testimony that she did not remember that the $ 10,000 checks had not been cashed. The Edith who supposedly did not remember in May is the same Edith who, some months before, had the presence of mind, she claimed, to photocopy only the fronts of the checks (and not the backs, since they had not been cashed) before giving the checks (now lost) to her attorney. We believe that Edith knew at the time she reviewed the Gift tax return that the $ 10,000 checks there set forth had not been cashed *299 and that her denial indicates that she has something to hide, viz, that filing the gift tax return was part of a scheme to deduct improperly the checks as a debt on the estate tax return. That fraudulent conduct is attributable to petitioner. Our overall impressions of Julia and Edith reinforce our conclusion that the testimony of each was, in certain respects, untruthful. We found each to be evasive, indirect in her testimony, and prone to convenient lapses of memory. O'Toole's Testimony
We also find O'Toole's testimony, respecting the $ 10,000 checks, to be incredible. One of the $ 10,000 checks was made out to O'Toole. He admitted that he never cashed that check. Nevertheless, he stated that Edith's mistaken statement that that check had cleared did not surprise him because, as he testified, Edith may well have cashed it with a facsimile stamp of his signature that he believed she carried around in her purse. We can accept the possibility of that. However, if O'Toole's testimony (that he thought Edith cashed the check) were to be believed, what did he think happened to the money? In addition, there was a $ 10,000 check made out to Edith, which O'Toole accepted had *300 been cashed. What did he think happened to that money? O'Toole does not strike us as the type of individual who would fail to notice a $ 10,000 to $ 20,000 omission from the family's bank accounts or finances. (After all, he was the individual chosen to prepare the necessary tax returns after petitioner's attorney had been dismissed.) Furthermore, there is no indication that he ignored, or was kept ignorant of, family financial information. We do not believe O'Toole's story, which, as a consequence, brings into doubt his claims as to what he was given or told by Edith (and Julia) concerning the $ 10,000 checks. Moreover, O'Toole's conduct throughout respondent's examination of the estate tax return reinforces our conclusion that a scheme was afoot. He lied when he stated to Pirri that the $ 10,000 checks were not available "as the bank does not return checks." The record is replete with checks drawn on the NOW account and returned to Edith and Julia. Even if O'Toole's statement were true in general, it would not be true with regard to the $ 10,000 checks, which never had been cashed. He also stated that those checks had cleared after decedent's death, which was untrue. Failure *301 to cooperate with respondent may be evidence of a taxpayer's intent to evade taxes. See Almeda v. Commissioner, T.C. Memo. 1983-598; Collier v. Commissioner, T.C. Memo. 1983-564. Also, misleading statements made during the course of an examination are an indicia of fraud. McManus v. Commissioner, T.C. Memo. 1972-200, affd. without published opinion 486 F.2d 1399 (4th Cir. 1973); Smith v. Commission, T.C. Memo. 1980-410; Coscia v. Commissioner, T.C. Memo. 1981-47. Overall, it is clear that O'Toole's behavior was fraudulent. Further, we simply cannot believe that, by the time respondent's examination focused on the $ 10,000 checks, O'Toole had not discussed those checks with his wife or Julia and learned that they had not been cashed. O'Toole's misrepresentations sharply undercut petitioner's argument that there was a simple misunderstanding and reinforce our belief that petitioner's personal representatives and O'Toole sought to defraud the Government. To summarize, we disbelieve petitioner's explanation of the facts surrounding its deduction of the $ 10,000 checks. *302 Inconsistencies and implausibilities make that story unbelievable. We cannot say with certainty whether the $ 10,000 checks were written after decedent's death and backdated. We are certain, however, that when petitioner's personal representatives, Edith and Julia, signed the estate tax return, each did so knowing that it (and the gift tax return) was inaccurate and with the intent to evade tax. O'Toole lied to Pirri. We believe that the three schemed together. We, thus, sustain the addition to tax under section 6653(b)(1).
As to section 6653(b)(2), respondent would have us find that all of the underpayment is due to fraud. That we will not do, although we are troubled by the conduct of petitioner's personal representatives respecting items other than the $ 10,000 checks. We are troubled that in excluding two-thirds of each of the Riggs accounts, Edith and Julia seems to have picked a number out of the air to represent Edith's claimed contributions to those accounts. We are also troubled by the lack of substantiation for many of the claimed deductions, after Edith and Julia had been warned by their attorney of the necessity of substantiation. Further, some of the claimed deductions seem highly improbable, such as the claim that Edith *303 made 53-weekend visits to decedent's residence during a 31-week period. We also have grave doubts about the $ 56,000 in gift checks drawn during November and December. However, we cannot take petitioner's failure to carry its burden as equivalent to respondent's meeting her burden with regard to fraud. Petzholdt v. Commissioner, 92 T.C. 661, 700 (1989). Respondent could have called some of decedent's grandchildren to testify as to what they knew. She did not. We will not sustain the section 6653(b)(2) fraud addition with regard to the underpayment relating to the $ 56,000 in gifts. Nor will we, despite our misgivings, sustain the section 6653(b)(2) fraud addition with regard to the bank accounts or certain of the unsubstantiated deductions. We thus find, as to section 6653(b)(2) that to the extent of deducting the four $ 10,000 checks and to that extent alone, petitioner acted in a fraudulent manner with intent to avoid tax. Decision will be entered under Rule 155. Footnotes
1. Rule 151 provides in part as follows: RULE 151. BRIEFS * * * We have deduced that relationship; it is not clear from the record.
*
(e) Form and Content: * * * *
(3) * * * In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact. In the instant case, the parties filed simultaneous opening and reply briefs. Petitioner's reply brief does not contain any objections to respondent's proposed findings. Accordingly, we must conclude that petitioner has conceded respondent's proposed findings of fact as correct, except to the extent that petitioner's proposed findings are clearly inconsistent therewith. See Cunningham v. Commissioner, T.C. Memo. 1989-260↩ n.6. Petitioner's reply brief does contain a request for additional findings of fact. Such a request is not provided for by our Rules and, accordingly, that request will be disregarded.
2. Although petitioner did not explicitly raise the question, we think it equally clear that sec. 2040↩ reaches property beneficially owned by decedent.