T.C. Summary Opinion 2008-136

UNITED STATES TAX COURT

CARLOS FRANCO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26462-06S.               Filed October 28, 2008.

Carlos Franco, pro se.

<u>Kevin W. Coy</u>, for respondent.

DEAN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the years in

issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies of $2,307 and $3,855 in petitioner's 2001 and 2002 Federal income taxes, respectively.

Respondent concedes that petitioner has substantiated additional nontaxable deposits of $605 for 2001 consisting of: (1) $213 for a Federal tax refund; (2) $8 for a vehicle license fee rebate; (3) $165 for gifts; and (4) $219 for a Federal tax rebate.

The issues remaining for decision are whether petitioner: (1) Understated his 2001 and 2002 gross receipts on Schedule C, Profit or Loss From Business; (2) is entitled to claim Schedule C business expense deductions of $1,833 and $10,011 for 2001 and 2002, respectively, and (3) is entitled to greater allowances for itemized deductions than respondent determined for each year.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits received into evidence are incorporated herein by reference. When petitioner filed his petition, he resided in California.

Petitioner was self-employed during 2001 and 2002, operating a lawn care service. Petitioner filed Forms 1040, U.S. Individual Income Tax Return, and Schedules C for each year that respondent examined. On his Schedules C petitioner reported

Schedule C gross receipts of $19,100 and $39,933 for 2001 and 2002, respectively. Respondent's revenue agent (RA) and his Appeals officer (AO) reconstructed petitioner's Schedule C gross receipts for each year using the bank deposits method.[1] Their reconstructions include:

| Item | 2001 | 2002 |
|------|------|------|
| Total deposits | [1]$16,292 | [1]$39,418 |
| Taxable deposits | [2]15,053 | [2]33,578 |
| Cash expenditures that did not come from deposited funds or nontaxable sources | 16,725 | [3]11,520 |
| Adjusted Sch. C gross receipts | [4]31,778 | [4]45,098 |
| Understatement in Sch. C gross receipts | [5]12,678 | [5]5,165 |

[1]  For 2001 the RA determined that petitioner had total deposits of $16,172 and $120 into his Bank of America and Washington Mutual accounts, respectively. For 2002 the RA determined that petitioner had total deposits of $38,978 and $440 into his Bank of America and Washington Mutual accounts, respectively.

[2]  For 2001 the RA allowed petitioner reductions for nontaxable deposits of $239 for returned checks and $1,000 for a loan payment received, determining taxable deposits of $14,933 and $120 into his Bank of America and Washington Mutual accounts, respectively. For 2002 the RA determined total deposits of $38,978 and $440 into his Bank of America and Washington Mutual accounts, respectively. The RA allowed petitioner reductions for nontaxable deposits of: (1) $50 for a returned check; (2) $981 for a Federal tax refund; (3) $1,700 for loan payments received; and (4) $5 from his total deposits. The RA determined taxable deposits of $36,247 and $435 into his Bank of America and Washington Mutual accounts, respectively. At petitioner's Appeals hearing, he provided a "register tape" to the AO in which he identified additional nontaxable deposits of $3,104 for 2002. The AO allowed petitioner an additional $3,104

---

[1]Figures have been rounded to the nearest dollar.

reduction from the $36,247 in taxable deposits with respect to the Bank of America account.  The AO determined that petitioner had total taxable deposits of $33,578 for 2002.

[3]  The RA determined cash expenditures of $16,520.  The AO reduced the $16,520 figure by the $5,000 cash hoard that petitioner at that time claimed he had on hand for use in 2002.  The AO determined cash expenditures of $11,520.

[4]  $15,053 (2001 taxable deposits) + $16,725 (2001 cash expenditures) = $31,788.  $33,578 (2002 taxable deposits) + $11,520 (2002 cash expenditures) = 45,098.

[5]  $31,778 (2001 adjusted Schedule C gross receipts) – $19,100 (2002 Schedule C gross receipts petitioner reported) = $12,678.  $45,098 (2002 adjusted Schedule C gross receipts) – $39,933 (2002 Schedule C gross receipts petitioner reported) = $5,165.

Petitioner's reported Schedule C expense deductions and

respondent's allowances therefor include:

| Item | Per return | | Respondent allowed | |
|---|---|---|---|---|
| | 2001 | 2002 | 2001 | 2002 |
| Depreciation | | $8,268 | | $3,722 |
| Special depreciation | | 10,631 | | 7,976 |
| Sec. 179 expenses | 3,310 | 6,769 | 3,310 | 6,304 |
| Legal & profl. servs. | 169 | 225 | 169 | 225 |
| Taxes & licenses | | | | 89 |
| Other expenses: | | | | |
|   Safety boots | 220 | 340 | 220 | 340 |
|   Fuel | 1,380 | 1,409 | 1,186 | 1,409 |
|   "MISC"[1] | 1,800 | 3,500 | -0- | -0- |
|   "Telephone" | 366 | 291 | 366 | 291 |
|   "SCE" | 493 | 516 | [2]-0- | [2]-0- |
|   Vehicle tags | | 55 | | 55 |
|   AAA club | | 71 | | 71 |
| Deduction for bus. use of home | | | [2]416 | [2]434 |
| Vehicle ins. | | | [3]654 | [3]1,671 |

[1]According to the RA, "[Petitioner said "MISC"] was an estimate of expenses he forgot to deduct elsewhere."

[2]Respondent represents that "SCE" is a "utility" and that the

RA allowed 6 percent of the "SCE" expenses in the calculation of petitioner's deductions for the business use of his home for 2001 and 2002, even though petitioner did not claim a deduction for the business use of his home for either year on his Schedules C.

[3]The AO determined a 90-percent business use of petitioner's vehicle(s).

The $31,778 in adjusted 2001 Schedule C gross receipts less $6,321 in allowed Schedule C expense deductions generated a $25,457 net profit for 2001 rather than the $11,362 net profit that petitioner reported. The $45,098 in adjusted 2002 Schedule C gross receipts less $22,587 in allowed Schedule C expense deductions generated a $22,511 net profit for 2002 rather than the $7,769 net profit that petitioner reported.

Other pertinent items reported by petitioner and respondent's adjustments thereto include:

| Item | Per Return | | Respondent's Adjustments | |
|------|------|------|------|------|
| | 2001 | 2002 | 2001 | 2002 |
| Self-emp. tax[1] | $1,605 | $3,597 | $1,098 | $3,181 |
| Deduction for self-emp. tax[1] | 803 | 549 | 1,799 | 1,591 |
| Form 1040 taxable income | 6,624 | 393 | 8,704 | 14,093 |
| Form 1040 "total tax" | 2,518 | 1,137 | 4,825 | 4,992 |
| Form 1040 interest income | 5,089 | | [2]2,346 | |

[1]The adjustments to petitioner's self-employment taxes and his deductions therefor are computational and are resolved consistent with the Court's decision.

[2]Petitioner received $2,743 from "Santoro Limited" and reported the amount as interest income on his Schedule B, Interest and Ordinary Dividends, for 2001. Respondent removed the amount and included it in petitioner's 2001 Schedule C gross receipts. For 2002 respondent did not adjust the $1,501

that petitioner received from "Santoro Limited" and reported as interest income. Petitioner originally argued that the bank deposits analysis was incorrect because $2,743 was included twice; i.e., in interest income and in his 2001 Schedule C gross receipts, but he abandoned this claim.

Although petitioner did not elect to itemize his deductions for either year, respondent allowed petitioner $12,826 in "Schedule A itemized deductions" for 2001 instead of the lesser $4,550 standard deduction. The 2001 "Schedule A itemized deductions" consist of $1,867 for real estate taxes and $10,959 for charitable contributions. No adjustments were made to petitioner's $4,700 standard deduction for 2002 or to his "Self-employed health insurance" deductions, which he reported as $1,574 and $1,991 for 2001 and 2002, respectively.

## Discussion

### I. Burden of Proof

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer has the burden to prove that the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). But the burden of proof on factual issues that affect a taxpayer's tax liability may be shifted to the Commissioner if the taxpayer introduces credible evidence with respect to the issue. See sec. 7491(a)(1). Petitioner has not alleged or proven that section 7491(a) applies; therefore, the burden remains on him.

II.  Petitioner's Schedule C Gross Receipts

A taxpayer is required to maintain sufficient records to allow for the determination of his or her correct tax liability. Sec. 6001; Petzoldt v. Commissioner, 92 T.C. 661, 686 (1989).  If a taxpayer fails to maintain or does not produce adequate books and records, the Commissioner is authorized to reconstruct the taxpayer's income, and the reconstruction need only be reasonable in view of all the surrounding facts and circumstances.  See sec. 446; Petzoldt v. Commissioner, supra at 686-687; Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).  Indirect methods, such as the bank deposits method, may be used for such purposes. Holland v. United States, 348 U.S. 121 (1954).

The bank deposits method of determining income assumes that all money deposited into a taxpayer's bank accounts during a specific period constitutes gross income.  Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964); see also Tokarski v. Commissioner, 87 T.C. 74, 77 (1986) (bank deposits constitute prima facie evidence of income).  But the Commissioner must take into account any nontaxable source or deductible expense of which he has knowledge.  Price v. United States, supra at 677.  Under the bank deposits method:  (1) Bank deposits are totaled; (2) nonincome deposits, redeposits, or transfers are eliminated; (3) an excess of deposits, as adjusted, over reported income is considered unreported income; (4) cash expenditures that did not

come from deposited funds or nontaxable sources are added to unreported income; and (5) deductible expenses not accounted for in the taxpayer's return are allowed. <u>Bacon v. Commissioner</u>, T.C. Memo. 2000-257, affd. without published opinion 275 F.3d 33 (3d Cir. 2001).

Petitioner told the RA that he never deposited cash received in his lawn services business, only checks. Petitioner also told the RA that he calculated his Schedule C gross receipts by adding his bank deposits to his "1099-misc [income]". As noted by the RA, however, the $40,914 sum[2] does not match petitioner's reported $39,933 in Schedule C gross receipts for 2002. According to the RA, "he states that he forgot to report the cash received due to his medical condition [i.e., hearing and vision problems, and it was] not fraud because he did not intend to underreport his income."

The evidence shows that petitioner failed to provide adequate books and records to account for his Schedule C gross receipts. In addition, petitioner admitted to the RA that he did not report all of his income. Therefore, the Court finds that respondent's use of an indirect method to reconstruct petitioner's Schedule C gross receipts was reasonable.

---

[2]$39,413 (total deposits) + $1,501 ("1099-misc [income]") = $40,914.

At trial petitioner conceded Schedule C gross receipts of $31,173 and cash expenditures of $16,725 for 2001. After the parties' concessions, the parties limited their arguments to the disputed issues with respect to the 2002 bank deposits analysis. The Court addresses these arguments in turn.

Although petitioner also conceded that he paid expenses of $16,520 in cash during 2002, he argues that the 2002 bank deposits analysis is incorrect because his bank deposits totaled $34,739 while he reported $39,933 in Schedule C gross receipts. Thus, the "$5,193 [sic]" difference represents cash he received and reported. Therefore, the $16,520 of undeposited-cash expenditures that the IRS determined "never existed but rather $11,327 [sic] only." And after reducing the $11,327 figure by petitioner's $5,000 cash hoard, then only "$6,137 [sic]" remains in dispute as undeposited-cash expenditures for 2002.

Respondent contends that petitioner had additional amounts of undeposited-cash expenditures above the "$5,193 [sic]" figure. "All undeposited cash includes that amount. We're not saying he didn't report it."

Although petitioner told the RA that he never deposited cash received in his lawn services business, at trial he inconsistently asserted that he made deposits into his bank accounts "Through checks and cash money". In addition, neither petitioner's testimony nor his 2002 bank statements establish the

source of the $5,194[3] in cash that he received and allegedly reported as gross income; i.e., whether it consists of deposited amounts, nontaxable sources, or undeposited cash. Therefore, petitioner has not proven that he is entitled to a $5,194 reduction from the $11,250 in undeposited-cash expenditures.[4]

Petitioner next argues that the $11,250 in undeposited-cash expenditures for 2002 should be reduced to account for the $12,793 in checks that he cashed between 1984 and 1992 and allegedly placed into a shoe box hidden on a shelf above the washing machine in his garage. The funds were his "personal money that [he earned and paid taxes on] at one time".

Respondent contends that the funds "are current earnings from his lawn care business."

Petitioner testified that he was a "survivalist" who had saved $10 to $20 a week since he started working, and since he "hadn't used it in 25 years, [he decided to use it in 2002, and he told his customers that he would not accept cash during 2002]". Petitioner also testified that he did not know how much cash he had on hand for 2002 because it was not relevant to him.

_____

[3]This figure represents the correct amounted ($39,933 (reported Schedule C gross receipts) - $34,739 (total bank deposits)).

[4]The $5,194 for which petitioner asserts that he should get a reduction from his undeposited-cash expenditures has been taken into account in the computation of the understatement. See supra p. 4 table note 5.

During the initial interview on December 10, 2003, petitioner told the RA that he had between $35 and $40 in cash on hand for 2002. According to the RA, petitioner changed his story later that day, claiming that he had between $3,000 and $5,000 in cash on hand and that he had $1,500 in cash on hand by the end of 2002. At their next meeting, on February 19, 2004, petitioner claimed that he definitely had $5,000 on hand at the beginning of 2002. Petitioner knew he had $5,000 because he always had that amount and "he didn't take any money out of his cash hoard" during 2001, but "this time he stated [that he did not have any money on hand at the end of 2002]", according to the RA.

Petitioner also told the RA that nobody knows about his cash hoard because "he [lived] alone and had no personal life." At trial, respondent asked petitioner whether he showed his cash hoard to anybody and whether anybody else knew about it. Petitioner replied: "No, no, no. Of course not."

Petitioner, however, called a witness, Mr. Walton, to corroborate his cash hoard. Mr. Walton testified that he knew that petitioner had a shoe box, that petitioner "might make a withdrawal from his account and he never take it and turn it back in the bank. He'll put it in his shoe box." Mr. Walton testified that he knew this because he had seen petitioner put money in the shoe box, and it contained "Quite a bit of money.

Just like * * * over $20,000. Because he bought a truck out of the shoe box."

But when questioned by the Court, Mr. Walton testified that: (1) He did not go with petitioner to purchase the truck; (2) he knew the purchase money came from the shoe box because petitioner did not go to the bank for it, but he did not see petitioner take the purchase money out of the shoe box; (3) he knew that petitioner got the purchase money out of the shoe box "Because [petitioner] told me he did"; (4) he knew that the shoe box was in the garage "because [petitioner] had told [him about it]"; and (5) he had never seen the contents of the shoe box.

The Court accords little probative weight to, and views with suspicion, the testimony of Mr. Walton, petitioner's only corroborating witness. Mr. Walton's testimony was based on hearsay from petitioner. Even if the Court had determined that Mr. Walton's testimony was credible, his testimony would not support petitioner's inconsistent statements as to the amounts of his cash hoard, nor could his testimony show that the $11,250 in undeposited-cash expenditures should be reduced by the $12,793 in checks that petitioner cashed between 1984 and 1992 and allegedly did not spend until 2002.

Petitioner's testimony that he kept a cash hoard well over the $11,250 in undeposited-cash expenditures in a shoe box over his washing machine for 20 some years until he decided to spend

it in 2002 is at best self-serving.  See Parks v. Commissioner, 94 T.C. 654, 659 (1990).  The Court also finds improbable petitioner's claim that while he cashed $12,793 in checks between 1984 and 1992, he did not spend the money, and he kept it in a shoe box for use in 2002, despite maintaining various certificates of deposit and bank accounts.[5]  In addition, petitioner has inconsistently claimed that he had cash on hand for 2002 consisting of:  (1) $12,793 (checks cashed between 1984 and 1992); (2) $35 to $40; (3) $1,500; and (4) $3,000 to $5,000.  Simply put, petitioner's cash hoard assertion is riddled with inconsistencies and implausibilities and has not been supported by objective evidence in the record.  See  Parks v. Commissioner, supra at 659; Boone v. Commissioner, T.C. Memo. 1997-471, affd. without published opinion 208 F.3d 212 (6th Cir. 2000);Phillips v. Commissioner, T.C. Memo. 1984-133; In re Kelesyan, 153 Bankr. 927, 929-930 (Bankr. M.D. Fla. 1993).

On the basis of the foregoing, respondent's determinations of $16,725 and $11,250 in undeposited-cash expenditures for 2001 and 2002, respectively, are sustained.  Respondent's determinations of $31,173 and $45,098 of Schedule C gross receipts for 2001 and 2002, respectively, are sustained.  Insofar

---

[5]Aside from the Bank of America and Washington Mutual accounts, petitioner also held four certificates of deposit worth $47,320.79 as of Dec. 31, 2001.  Petitioner owned six certificates of deposit worth $63,148.56 as of Jan. 3, 2003.

as understatements to petitioner's Schedule C gross receipts for 2001 and 2002 are proposed, respondent's determinations are sustained.[6]

III.  Petitioner's Schedule C Expense Deductions

The 2001 Schedule C expense deduction in dispute is the $1,833 of the claimed $4,259 in other expenses that respondent disallowed.  Although the AO allowed petitioner a $654 expense deduction for vehicle insurance for 2001, respondent argues that the $1,833 figure consists of $194 for fuel, $493 for "SCE", and $1,800 for "MISC".  It is unclear from the record whether respondent allowed the $654 expense deduction as a separate item within the other expenses category or whether it offsets the $1,800 "MISC" expense for 2001 (i.e., only $1,146 of the "MISC" expense remains in dispute).

The 2002 Schedule C expense deductions in dispute are the $2,345 of the claimed $6,182 in other expenses and $7,666 of the claimed $25,668 in section 179 expenses and depreciation deductions that respondent disallowed.  Although the AO allowed petitioner a $1,671 expense deduction for vehicle insurance for 2002, respondent alleges that the $2,345 figure consists of $516

_____

[6]Respondent determined understatements of $12,678 and $5,165 for 2001 and 2002, respectively.  After taking into account the parties' concessions and the Court's allowances for Schedule C expense deductions, infra, the understatements in petitioner's Schedule C gross receipts are $11,906.40 and $4,980.50 for 2001 and 2002, respectively.

for "SCE" and $3,500 for "MISC".  It is unclear from the record whether respondent allowed the $1,671 expense deduction as a separate item within the other expenses category or whether it offsets the $3,500 "MISC" expense for 2002 (i.e., only $1,829 of the "MISC" expense remains in dispute).  The $7,666 figure consists of:  (1) $465 of the section 179 expense deduction; (2) $2,655 of the special depreciation allowance; and (3) $4,546 of the depreciation deduction.

Petitioner asserted that he had "proved them, and they're in [my exhibits, which I showed to the IRS]".

Petitioner told the RA that he had paid for the fuel in cash.  There is no evidence in the record substantiating payments of $194 for fuel in 2001.  Respondent's disallowance of the $194 fuel expense deduction for 2001 is sustained.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

With respect to the $1,800 and $3,500 deductions for "MISC" expenses for 2001 and 2002, respectively, petitioner has provided receipts substantiating payments of $46 to the franchise tax board for 2001, $99 for a permit for 2002, which bears an undecipherable notation, $175.50 for a building permit and landscaping business license for 2002, and vehicle expenses of: (1) $71 for "AAA Renewal" for 2001; (2) $63 for "DMV Renewal" for 2001; (3) $10 to the "City of Moreno Valley" for vehicle tags for

2002; and (4) $727.20 and $1,856.60 to Nationwide for automobile insurance for 2001 and 2002, respectively.

The Court finds that petitioner is entitled to deduct the $46 that he paid to the franchise tax board in 2001 and the $175.50 for the building permit and landscaping business license in 2002. See secs. 162, 164; see also Cunningham v. Commissioner, T.C. Memo. 1989-260 (and cases cited therein). Petitioner has not proven that the $99 permit for 2002, which bears the undecipherable notation, qualifies as an ordinary and necessary business expense and that is it not a nondeductible personal expense. See secs. 162, 262. Thus, he is not entitled to a deduction for that permit. The AO allowed petitioner deductions of $654 and $1,671 for vehicle insurance based upon a 90-percent business use.[7] Petitioner has not established that he is entitled to a greater business use percentage or that he is entitled to allowances for insurance greater than $654 and $1,671 for 2001 and 2002, respectively. Because the AO allowed petitioner a business use percentage of 90 percent, the Court will also allow petitioner 90 percent of his vehicle expenses for: (1) $63.90 for "AAA Renewal" for 2001; (2) $56.70 for "DMV Renewal" for 2001; and (3) $9 for the "City of Moreno Valley" vehicle tags for 2002. Compare Cohan v. Commissioner, 39 F.2d

---

[7]The RA determined business use percentages of 72 and 90 percent for petitioner's Ford and Toyota trucks, respectively.

540, 543-544 (2d Cir. 1930), with Sanford v. Commissioner, 50 T.C. 823, 827 (1968) (pursuant to section 274(d), the Court cannot estimate expenses with respect to certain items), affd. per curiam 412 F.2d 201 (2d Cir. 1969).

There is no evidence in the record substantiating payments of $465 for tools in 2002. Therefore, the Court finds that petitioner is not entitled to an allowance greater than the $6,304 that the RA allowed as section 179 expenses for 2002. Petitioner also has not proven any infirmity with respect to respondent's determinations disallowing $2,655 of petitioner's special depreciation deduction and $4,546 of his depreciation deduction. Accordingly, respondent's determinations are sustained.

Petitioner submitted canceled checks substantiating telephone payments of $361.90 and $71.65 for 2001 and 2002, respectively. It is unclear from the record whether respondent has already given petitioner allowances for these items or that the items qualify as deductible business expenses. See sec. 262(b) (charges for basic telephone service for the "1st telephone line" at the taxpayer's residence are treated as a nondeductible personal expense); see also secs. 274(d), 280F(d)(4)(A)(v) (requiring strict substantiation of cell phone expenses). Accordingly, petitioner is not entitled to allowances

greater than the $366 and $291 for "Telephone" that respondent allowed for 2001 and 2002, respectively.

Petitioner submitted canceled checks substantiating: (1) $328 and $341 for "Earthquake" insurance for 2001 and 2002, respectively; (2) $651 and $808 for "Home" insurance policies for 2001 and 2002, respectively; and (3) $696 for his homeowners' association fees for each year. Respondent allowed $29.58 and $30.96 of the "SCE" expense for 2001 and 2002, respectively. Respondent also allowed a $216 depreciation deduction for petitioner's home in the computation of the deduction for the business use of his home for each year. Petitioner has failed to establish that respondent erred in disallowing the claimed "SCE" expense with respect to petitioner's Schedule C and treating it as an expense for the business use of his home or that he is entitled to an allowance greater than 6 percent of the item.[8] Petitioner also has not established that he is entitled to deductions for the business use of his home greater than the $416 and $434 allowances that respondent determined for 2001 and 2002, respectively. Respondent's determinations are sustained.

IV. Petitioner's Itemized Deductions

Respondent allowed petitioner itemized deductions of $12,826 for 2001 consisting of $1,867 for real estate taxes and $10,959

---

[8]Petitioner told the RA that he paid "SCE" in cash; thus, he has not substantiated any payments to "SCE" for either year.

for charitable contributions.  Respondent allowed petitioner the $4,700 standard deduction for 2002.

Petitioner has submitted canceled checks or receipts substantiating:  (1) $1,869.96 and $1,969.54 for real estate taxes for 2001 and 2002, respectively; (2) $291 and $264 for charitable contributions for 2001 and 2002, respectively; (3) $2,448 and $3,110 for health insurance premiums for 2001 and 2002, respectively; and (4) medical/dental expenses of $56.69 for 2001.

Self-employed individuals may deduct 60 percent and 70 percent of their health insurance premiums for 2001 and 2002, respectively, and may deduct the excess thereof pursuant to section 213.  Sec. 162(l)(1), (3).  Petitioner claimed self-employed health insurance deductions of $1,574 and $1,991 for 2001 and 2002, respectively.  Respondent has made no adjustment to petitioner's claimed $1,574 self-employed health insurance deduction for 2001, although it should have been limited to $1,468.80 (60 percent of $2,448).  Petitioner has not proven that he is entitled to an amount greater than the $1,574 that respondent allowed as a self-employed health insurance deduction for 2001, but he may deduct the $874[9] excess in the amount allowed by section 213.  Petitioner's self-employed health

_____

[9]2001 substantiated health insurance premium payments of $2,448 less the $1,574 self-employed health insurance deduction that respondent allowed.

insurance deduction for 2002 is limited to $2,177 (70 percent of $3,110).  Because petitioner only deducted $1,991, he is entitled to deduct an additional $186 as a self-employed health insurance deduction for 2002.  In addition, petitioner may deduct the $993[10] excess in the amount allowed by section 213.  See secs. 63(e)(1), 162(l)(3).  In the end, however, petitioner is not entitled to deduct his section 213 medical expenses for either year because the amounts do not exceed the 7.5-percent floor of section 213(a) and he did not elect to itemize his deductions. See sec. 63(e)(1).[11]

The RA allowed $10,718 as noncash contributions for 2001 based upon "cash receipts from grocery stores and so forth".  The AO, however, allowed charitable contributions of $10,959. Petitioner's exhibit indicates that of the $291 in canceled checks that he submitted into evidence respondent has already

---

[10]2002 substantiated health insurance premium payments of $3,110 less the allowable $2,177 self-employed health insurance deduction.

[11]The sum of petitioner's sec. 213 medical expenses for 2001 is $930.69 ($874 (excess health insurance premiums) + $56.69 (substantiated medical/dental expenses)).  Taking into account respondent's adjustments and the Court's findings, petitioner's adjusted gross income (AGI) for 2001 is $23,713.43.  To exceed the 7.5-percent floor of sec. 213, petitioner's medical/dental expenses must exceed $1,778.51 for 2001.

The sum of petitioner's sec. 213 medical expenses for 2002 is $993 (excess health insurance premiums).  Taking into account respondent's adjustments and the Court's findings, petitioner's AGI for 2002 is $21,496.18.  To exceed the 7.5-percent floor of sec. 213, petitioner's medical/dental expenses must exceed $1,612.21 for 2002.

given petitioner an allowance of $241.  The Court will allow petitioner an additional $50 deduction as a charitable contribution for 2001.  See <u>Cohan v. Commissioner</u>, 39 F.2d at 543-544.  The Court will also allow petitioner a $1,869.96 deduction for real estate taxes for 2001 rather than the $1,867 figure that respondent allowed.

Petitioner did not elect to itemize his deductions for 2002, and the $2,233.54 sum[12] does not exceed the $4,700 standard deduction for 2002.  See sec. 63.  Respondent's determination is sustained.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.

---

[12]$1,969.54 (real estate taxes) + $264 (charitable contributions) = $2,233.54.

APPENDIX

The figures in this appendix are for illustrative purposes only.  Computations in accordance with Rule 155 will be necessary.  The figures take into account respondent's determinations, the parties' concessions, and the Court's allowances.

| Sch. C deductions | 2001 | 2002 |
|---|---|---|
| Safety boots | $220.00 | $340.00 |
| Fuel | 1,186.00 | 1,409.00 |
| Telephone | 366.00 | 291.00 |
| Franchise tax bd. | 46.00 | |
| Licenses or permits | | 175.50 |
| Vehicle ins. | 654.00 | 1,671.00 |
| AAA | 63.90 | 71.00 |
| Vehicle tags/DMV | 56.70 | 64.00 |
| Deduction for bus. use of home | 416.00 | 434.00 |
| Legal & profl. servs. | 169.00 | 225.00 |
| Tax & licenses | | 89.00 |
| Depreciation & sec. 179 expenses | 3,310.00 | 18,002.00 |
| Total | 6,487.60 | 22,771.50 |

| Sch. C profit/loss | 2001 | 2002 |
|---|---|---|
| Gross receipts | $31,173.00 | $45,098.00 |
| Deductions | -6,487.60 | -22,771.50 |
| Net profit | 24,685.40 | 22,326.50 |

| Self-emp. tax comp. | 2001 | 2002 |
|---|---|---|
| Net profit sch. C | $24,685.40 | $22,326.50 |
| | x [1]92.35% | x [1]92.35% |
| Net earnings | 22,796.97 | 20,618.52 |
| | x [2]15.30% | x [2]15.30% |
| Self-emp. tax | 3,487.94 | 3,154.64 |
| | x [3]50.00% | x [3]50.00% |
| Self-emp. tax deduction | 1,743.97 | 1,577.32 |

| Form 1040 items | 2001 | 2002 |
|---|---|---|
| Taxable interest | $2,346.00 | $2,864.00 |
| Bus. income | 24,685.40 | 22,326.50 |
| Self-emp. tax deduction | -1,743.97 | -1,577.32 |
| Self-emp. ins. deduction | -1,574.00 | -2,117.00 |
| AGI | 23,713.43 | 21,496.18 |

[1]  See secs. 1401(a) and (b), 1402(a)(12) (which allows as a deduction one-half of the self-employment tax rate; thus, 92.35 percent of the Schedule C net profit is subject to self-employment tax).

[2]  See sec. 1401(a) and (b) (the rate of tax imposed upon self-employment income is the sum of 12.4 and 2.9 percent).

[3]  See sec. 164(f) (which allows as a deduction one-half of the self-employment taxes).